**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:10-cv-00955 |
| v. | ) ) | Judge Darrah Magistrate Judge Cox |
| DR. GERALD HORN, | ) ) | |
| Defendant. | ) | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dr. Gerald D. Horn, for his Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, states:

The Securities & Exchange Commission has brought insider trading charges against Dr. Horn based upon four listed LCA Vision, Inc. option trades and one trade in LCA Vision, Inc. common stock.    (Cplt. ¶¶60-65, 67-77, 78-82, 83-90, 91-103).  The SEC's delusively simple thesis runs this way.  Because Dr. Horn's trades were highly successful and because, as a result of his surgical position with LCA, he had *access* to "insider" LCA information through LCA's computers at his work locations, his trading success must have stemmed from his actually having availed himself of that access to obtain information on which to trade. Under this view of the securities laws, every corporate insider with a handful of winning trades in his company's stock necessarily violates Section 10(b) of the Securities Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder.  (78 U.S.C. §78j(b) and 17 CFR 240.10b-5).

The purported material, nonpublic information is alleged to have been contained in Eyes By Laser Reports ("EBL reports"), which reflect at a date certain, information

1

concerning revenue and surgical procedures. (Cplt. ¶¶33-36).[1] This Motion does not raise the issue of "materiality," and thus it assumes without conceding that as of a given date, EBL reports might contain material, nonpublic information. Instead, this Motion is based upon the absence of evidence of the threshold requirement that Dr. Horn *possessed* any nonpublic information from any EBL report. Dr. Horn has denied such possession and submitted to two lengthy SEC depositions on this issue in which he answered every question asked, refusing none on constitutional or other grounds. (Horn Local Rule 56.1(a)(3)Statements 15-16, 19, hereafter "HLR __"). The SEC has admitted in its sworn interrogatory answers that after four years of investigation (HLR 18), it has *no* direct evidence that Dr. Horn possessed any nonpublic information or, indeed any direct evidence that he accessed any EBL report: "[T]he SEC is not currently aware of *any* specific person who has claimed to the SEC traded in LCA stock or stock options based upon or in possession of material, nonpublic information."; "the SEC has not alleged that any person specifically observed Dr. Horn access any specific [EBL] report." (HLL 2, 3,. HLR Exh. 2, Answers 1(b) and 2(b)(5)).

Thus, the SEC cannot identify:

- any specific EBL report that Dr. Horn is said to have accessed;
- the specific date of such access;
- the time of day of such access:
- the specific LCA computer from which the (as yet unspecified) report was accessed; or
- any "document, electronic or otherwise, that reflect Dr. Horn's having accessed the report." (HLR 9, 10, 11).

All the SEC can say is that according to Maria Moreno and Allison Foster, Dr. Horn

---

[1] The SEC acknowledges that it does *not* contend that "Dr. Horn was in possession of material nonpublic information or traded on the basis of material, nonpublic information *other than Eyes by Laser Reports.* (HLR 1).

"routinely used the computers in the common areas and the computers designated for Center

Directors." But *all* of the LCA employees used the computers; that's what the computers

were there for. (HLR 23 and HLR Exhibit 2 at Answer 2). The essence of the SEC's

position—that "access" is tantamount to having access<u>ed</u>—would support an Internet

pornography prosecution based on the possession of pornography available through non-

computer means and the mere ownership of a computer given the access it affords.

Significantly, despite their "routine" observation of Dr. Horn's open and notorious computer

usage—a clumsy tactic for a putative securities defrauder [2]—Ms. Moreno and Ms. Foster

*never* saw Dr. Horn access *the EBL reports.* (HLR 24, 25).

The conceded absence of EBL evidence does not stand alone. The specific "analyst

reports" whose "targets" were allegedly compared to the (unidentified) EBL reports (Cplt.

¶8) are also unknown to the SEC. (HLR 12, 13).

The admitted void of evidence of the core allegations of the complaint cannot be

minimized with temporal qualifiers such as "not currently aware" or "at this time." (HLR

Exh. 2, Answers 1, 3, 8, 12). The SEC conducted a four-year, plenary investigation of Dr.

Horn, pursuant to which it subpoenaed and received thousands of documents, conducted

15 thorough, recorded administrative examinations under oath, and enjoyed the unbridled

cooperation of LCA's counsel, who promptly supplied all information requested. (HLR 20,

21).

---

[2] Violators *"hide* evidence of insider trading," rather than advertise it, as the SEC often reminds. See <u>SEC v. Blackwell</u> , 291 F.Supp.2d 673, 683 n.3 (S.D.Ohio 2003); <u>S.E.C. v. Anticevic</u>, 2009 WL 4250508 *5 (S.D.N.Y. November 30, 2009); <u>SEC v . Heden,</u> 51 F.Supp.2d 296, 300 (S.D.N.Y. 1999); <u>SEC v. Warde,</u> 151 F.3d 42, 49 (2d Cir. 1998).

As the SEC's interrogatory answers reveal, that exhaustive investigation left the SEC right where it began—with a person who had a smattering of successful trades and mere "access" to certain information, with no evidence whatsoever that the information was actually possessed, much less used. Little wonder that in response to interrogatories directly asking for the actual reports consulted, the SEC the responds by reiterating the complaint's allegations: "As alleged in the Complaint," or "the SEC alleges," with no supporting proof, much less a direct answer. (See HLR Exh. 2, SEC Interrogatory Answers 2(b)(1)-(10)).

But allegations of a complaint are not a substitute for proof, especially on summary judgment, where "the nonmoving party must go *beyond the face of the pleadings..to* demonstrate, *through specific evidence,* that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the nonmoving party's favor." Lancaster Williams v. Pods Enterprises, Inc., 2010 WL 2382402 (N.D. Ill., June 10, 2010)(Dannah, J.)(collecting cases)(Emphasis supplied). Indeed, "to survive a motion for summary judgment, a party is required to `wheel out all its artillery to defeat it.'... This is why summary judgment has been called the `put up or shut up' moment in a lawsuit." York v. Peake, 2008 WL 4845321 *3 (N.D.Ill. November 5, 2008)(Darrah, J.)(citations omitted). Accord Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir.2008).

The interrogatory answers "wheel out" nothing other than the rank speculation that the purported "incredible success of his trading" must have stemmed from Dr. Horn's "access to material, nonpublic information." (HLR Exh. 2, Answer 1(b)). But "speculation does not create a genuine issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment." Tyler v. Runyon 70 F.3d 458, 469 (7th Cir. 1995)(Emphasis in original). Accord Sybron Transition Corp. v. Security Inc. Co. of Hartford, 107 F.3d 1250, 1254 (7th Cir. 1997). This principle applies fully to questions of

4

causation, such as the cause of Dr. Horn's trading success. <u>Bartholomew v. United States,</u> 2010 WL 960357 *3 (N.D.Ill. March 11, 2010)(Darrah, J.)("Mere speculation about the cause of unnatural accumulation is not enough to defeat a motion for summary judgment, and Illinois appellate courts have affirmed summary judgments when the plaintiff has failed to show specific evidence of a causal link between a defendant's actions and the unnatural accumulation."). And it has been a recurring theme in summary judgment decisions against the SEC in insider trading cases, as discussed below.

The courts have unhesitatingly granted summary judgment against SEC charges of insider trading where all that the SEC could point to was "access" to nonpublic information and the speculation that a defendant actually availed himself of it. Illustrative is <u>S.E.C. v. Truong</u>, 98 F.Supp.2d 1086 (N.D.Cal. 2000) in which Hahn, an insider, was alleged to have traded based upon access to nonpublic financial reports concerning whether his company would meet revenue forecasts. Because, as here, there was no evidence that Hahn actually saw these reports, the SEC resorted to arguing that "Hahn may have obtained information about Molecular's first quarter finances by looking for such information or by viewing the information in an open cubicle." <u>Id</u>. at 1092.

But Hahn's mere "physical opportunity" to obtain the information—i.e. access—and the "strained inferences and speculation" that he did so could not withstand summary judgment. 98 F.Supp.2d at 1092, 1098, 1101. Hahn's access to the nonpublic information "was the same as any other MDI employee," <u>id</u> at 1098 just as was the case at LCA according to Ms. Moreno and Ms. Foster, <u>supra</u>. (HLR 22, 23). Finally, Hahn's "opportunity" included "routine interactions with senior management" who were privy to the nonpublic information at issue, which likewise was too speculative to avoid summary

5

judgment on the issue of possession. Id. at 1098. This is analytically indistinguishable from Dr. Horn's "routine," computer access observed by Ms. Moreno and Ms. Foster upon which the SEC relies. See supra.

These same themes found expression in S.E.C. v. Alejandro Duclaud Gonzalez de Castilla, 184 F.Supp.2d 365 (S.D.N.Y. 2002), which likewise granted summary judgment where the critical element of actual possession of nonpublic information was speculative. Like Truong, it flatly rejected the conjectural thesis that "access" sufficed for proof of actual possession. 184 F.Supp.2d at 376-380. This dispositive principle was recently reaffirmed in SEC v. Rorech, 2010 WL 2595111 *43 (S.D.N.Y. June 25, 2010)("Potential 'access' to material, nonpublic information, without more, is insufficient to prove that Mr. Rorech actually possessed any such information.").

Because the SEC has no evidence of Dr. Horn's actual possession of nonpublic information, it seeks to bootstrap its way there by pointing to Dr. Horn's trading success—i.e., he must have had inside information, how else could he have been so successful? (HLR Exhibit 2, SEC Interrogatory Answers, Answer 1(b)). The proposition that a short, successful trading pattern requires the aid of nonpublic information is silly. And it is akin to the SEC's failed attempt to reason backward in Truong—as here after years of investigation—that "suspicious" trading activity necessarily evidenced possession of nonpublic information:

> Allowing the SEC to tell a jury that 'because the tipper's trading was suspicious, the tipper must have possessed some material nonpublic information,' would relieve the SEC of its burden to identify the information, prove its materiality, and prove possession and use by the tipper. Moreover, although the SEC may prove that a defendant possessed material nonpublic information through the use of circumstantial evidence (beyond alleged 'suspicious' trading), the Agency may not rest on evidence that would require a jury *to speculate* that the defendant possessed that information. Courts stress that the SEC may not base insider trading actions on strained inferences and speculations. ... 'The

6

> summary judgment tool filters out cases in which plaintiffs rely entirely upon conclusory assertions and speculative allegations to state a claim for relief. After a respectable period of time for discovery... reliance upon pure speculation is unacceptable.'
>
> ***
>
> In short, a finding that Hahn possessed any particular document would require speculation on the part of a jury. Despite many years of investigation, including dozens of depositions, the SEC failed to garner direct or circumstantial evidence that Hahn possessed material, non-public information.

98 F. Supp.2d at 1098-99 (Emphasis in original)(citations omitted).

Employees commonly trade their company's stock legitimately, because it is the company with which they are most concerned, involved, and hence familiar. For the SEC, any repeated success in doing so *necessarily* proves possession and usage of material, nonpublic information. No authority supports this novel proposition, acceptance of which would either cripple the courts with insider trading cases or end employee shareholdership since only losses would be lawful. The SEC's inherent premise redefines the violation to consist simply of *profitable* trading by insiders. The profit *simpliciter* establishes the possession and usage of material nonpublic information and thereby supplants those elements. Because all insider trading cases involve hypothetical access to information and successful trades—regulators don't care about losers—all would begin *and end* with the winning trade. Illustrative was Mr. Hahn's wise decision in Truong to sell his stock in the weeks prior to Hahn's company's announcement that it had failed to meet revenue expectations.

Baldly calling Dr. Horn's success "incredible" is doubly infirm. First, that is just another way of saying his trading was "suspicious," which Truong holds will not supply the missing possession element. Second, it is merely to rely upon the Complaint's equally conclusory allegation that "the probability of obtaining such results without reliance on inside information is very low." (HLR Exhibit 1, SEC Complaint ¶58). We probed the basis

7

of this claim by asking the SEC to "identify all evidence, including evidence of statistical

probability, upon which Plaintiff relies for the conclusion alleged in paragraph 58 concerning

'probability.'" Again, the SEC had nothing:

> "At this time, the SEC does not rely on any evidence of statistical probability
> in support of its allegations included in paragraph 58 of the Complaint. The
> SEC notes that it is not required to submit any such evidence; a factfinder is
> permitted to draw all reasonable inferences from the evidence presented."
> (HLR 26 and Exhibit 2 thereto).

If not "at this time," when? And when does the SEC intend to determine *which* EBL reports

were even possessed by Dr. Horn such that it was justified, under Rule 11, in filing a

complaint replete with unequivocal charges that EBL reports were illicitly relied upon? (See

e.g. HLR Exhibit 1, SEC Complaint ¶60, "During early December 2005, Horn reviewed Eyes

by Laser Reports..."; see id. at ¶¶62, 67, 69, 72, 78, 80, 83, 85, 91,93, 95, and 97).

For the SEC, these leisurely answers should await the further dissipation of Dr. Horn's

savings defending allegations that, after four years of investigation, remain unsupported by

actual evidence. S.E.C. v. Buntrock, 2003 WL 260711 *1 (N.D.Ill. February 3, 2003)("The

defendants in this case have been investigated and sued by the United States Securities and

Exchange Commission ("SEC"), a process which is expensive and debilitating to them in

many respects."). Rule 56, however, takes a different approach. See Harney v. Speedway

SuperAmerica, LLC, 526 F.3d 1099, 1103 (7th Cir. 2008)("summary judgment is not a

disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole,

which are designed to secure the just, speedy, and inexpensive determination of every

action."). Accord Celotex Corp. v. Catrett, 477 U.S. 312, 318 (1986).

Moreover, the SEC's "probability" allegation overlooks its investigatory (and hence

unimpeded) depositions of Dr. Horn's veteran securities brokers at Bear Stearns. Each was

asked whether Dr. Horn's success rate indicated insider trading. Each was adamant that it did

8

not and that it was not at all uncommon. Thus, Mr. Gildea testified that the fact that Dr. Horn had "picked a number of trades extremely well" did not suggest that he was "perhaps ...being a little too lucky." (HLR 29 and Exh. 17 thereto at 110). To be sure, other of his clients had had a "hot hand," "at least three in a row." (HLR 12 and Exh. 17 thereto at 59). Mr. Cohen likewise was never "concerned that Dr. Horn was guessing correctly too many times in a row." (HLR 29 and Exh. 18 thereto at 65). He too had "seen people be successful a number of times and they start to think they have a formula for success...." (HLR 29 and Exhibit 18 thereto at 57). Nor did he ever hear anything that "caused his antennae to go up" regarding nonpublic information. (HLR 29 and Exhibit 13 thereto at 55). While Cohen and Gildea joked that Dr. Horn was going to be "cocky" because he had "just got lucky three or four times in a row," (HLR 29 and Exhibit 17 thereto at 109), on the sober matter of whether Dr. Horn had done anything wrong, they plainly believed that he had not. (HLR 30).

The SEC has not challenged this testimony. To the contrary, asked whether it "believes that any third party testified falsely in connection with the investigation underlying the instant Complaint," the SEC swore that "at this time, [it] has insufficient information to determine whether any third party testified falsely in connection with the investigation underlying the instant Complaint." (HLR 28). Indeed, the commonality of winning streaks (e.g. three or five winning stock trades in a row, etc.) has been recognized, even where trades are placed completely at *random.* (HLR 29 and HLR Exh. 21). Messrs. Cohen and Gildea were clear that Dr. Horn's trading was not merely the product of "random" guesses. Rather, he had done significant "homework," "more than a lot of people do." (HLR 30). He was "very smart" and spoke "very eloquently" about LCA valuations and earning trends. (HLR 30).

Other SEC deponents whose veracity it has not challenged include other LCA eye

9

doctors who attributed their repeated success trading LCA options to their evaluation of seasonal stock price factors, not nonpublic information. This is precisely what Dr. Horn has said. None of these identically situated doctors has been accused of wrongdoing of any kind. (HLR 27).

Finally, while the issue of "materiality" is not presently up for decision, the failure by the SEC to identify any specific EBL report viewed by Dr. Horn means that a jury would be required to engage in utter speculation concerning whether the unidentified "nonpublic" information was "material." This is not a case where nonpublic information is indisputably "material," such as discovery of a uranium deposit or a decision to acquire another company.

Here, the "nonpublic" information is admittedly itself incomplete. The EBL reports do not contain either non-surgical revenue information or expenses. Therefore, even if identified by the SEC, there would remain a question concerning the "materiality" of the information for purposes of judging whether a future earnings report, based on all revenue and dependent on unknown expenses, would meet or exceed guidance. When the Assistant General Counsel for LCA Vision was interviewed by the SEC, he stated in substance that the EBL reports were *not material* because of their omission of revenue and expense information. (HLR 17). In that context, the burden on the SEC to prove "materiality" is insurmountable where the specific nonpublic information is not identified.

## Conclusion

The SEC's burden in an insider trading case is no less than any other party in any other case; "summary judgment is appropriate in *any* case where the critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." ...Thus, regardless of whether the evidence offered is direct or circumstantial, the " 'mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff...."Although reasonable inferences must be drawn in the SEC's favor,

10

the SEC cannot merely provide circumstantial evidence to show the possibility of illegal trading. The SEC's evidence must be sufficient to allow a reasonable jury could [sic] find it met its burden of persuasion at trial.".

S.E.C. v. de Castilla, supra, 184 F.Supp.2d at 376 (citations omitted).

"Lest speculation substitute for reason," id, the conceded lack of evidence in this case requires its dismissal. Summary judgment is not discretionary. "If the plaintiff lacks enough evidence, summary judgment must be granted." Jones v. Johnson, 26 F.3d 727, 728 (7th Cir. 1994).

Respectfully submitted,

PETER SHAEFFER

ANDREW STAES

Law Offices of Peter Shaeffer
30 N. LaSalle Street
Suite 2140
Chicago, IL 60602
(312) 782-5306

Staes & Scallan, P.C.
111 W. Washington Street
Suite 1631
Chicago, IL 60602
(312) 201-8969

CERTIFICATE OF SERVICE

I, Andrew Staes, hereby certify that I have caused Defendant's Motion For Summary

Judgment   to be served upon:


Robin Andrews
Gregory Paul Von Schaumburg
SECURITIES & EXCHANGE COMMISSION
175 W. Jackson Street
Suite #900
Chicago, Illinois 60604-2601
*via E.C.F. Notice on July 27, 2010.*


ANDREW STAES