**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

_____

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES** | : | |
| **AND EXCHANGE COMMISSION,** | : | |
| | : | |
| | : | **CASE NO.  1:10-cv-00955** |
| **Plaintiff,** | : | |
| | : | **Hon.  John W. Darrah** |
| **v.** | : | |
| | : | **Magistrate Judge Susan E. Cox** |
| **GERALD D. HORN,** | : | |
| | : | |
| **Defendant.** | : | |

_____

**SEC'S OPPOSITION TO DEFENDANT HORN'S**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.  Introduction...............................................................................................1

II.   The Issue for Summary Judgment. .............................................................2

III.  Summary Judgment Standard. ...................................................................3

IV.  What the SEC must establish to prove its insider trading claims against
Defendant Horn.........................................................................................4

V.  The SEC may prove its case through circumstantial and direct evidence. ..................8

VI.  A factfinder could draw a compelling inference from various facts in this case
that the Defendant engaged in insider trading. ...........................................11

 A.  The Defendant's explanations for his trades were both internally
 inconsistent and inconsistent with the facts; a factfinder could draw an
 inference from this that he engaged in insider trading..................................12

 B.  Eyes by Laser Reports were openly posted in at least two of the three
 facilities where Defendant Horn worked .....................................................16

 C.  A factfinder could draw an inference from numerous other facts that
 Defendant Horn engaged in insider trading..................................................16

VII.  CONCLUSION...........................................................................................18

## TABLE OF AUTHORITIES

FED. R. CIV. P. 56(c). ...................................................................................................3

BLACK'S LAW DICTIONARY, Seventh Edition (1999) ....................................................8

William P. Richardson, THE LAW OF EVIDENCE § 111, at 68 (3d ed. 1928) ..................8

John H. Wigmore, A STUDENTS' TEXTBOOK OF THE LAW OF EVIDENCE 40 (1935)........8

SEC v. Adler, 137 F.3d 1325 (11th Cir. 1998)...............................................................5

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)...................................................3

Basic, Inc. v. Levinson, 485 U.S. 224 (1988).................................................................4

Chiarella v. U.S., 445 U.S. 222 (1980)...........................................................................5

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976).........................................................5

Herman & MacLean v. Huddleston, 459 U.S. 375 (1983) ..............................................8

Howard v. BP Oil, Co., 32 F.3d 520, 526 (11th Cir. 1994).............................................12

Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)..........3

Michalic v. Cleveland Tankers Inc., 364 U.S. 325 (1960) .............................................2, 9

Michaels v. Michaels, 767 F.2d 1185 (7th Cir. 1985) ....................................................9

SEC v. Michel, 521 F. Supp. 2d 795, 823 (N.D. Ill. 2007) .............................................12, 18

Lesch v. Crown Cork & Seal, Co., 282 F.3d 467 (7th Cir. 2002) ...................................3

U.S. v. O'Hagan, 521 U.S. 642 (8th Cir. 1997)..............................................................4

SEC v. Roszak, 495 F. Supp. 2d 875 (N.D. Ill. 2007)....................................................*passim*

SEC v. Sargent, 229 F.3d 68, 75 (1st Cir. 2000) ...........................................................9, 11, 18

SEC v. Truong, 98 F.Supp.2d 1086 (N.D. Cal. 2000)....................................................9, 10

SEC v. Van Wagner, 1999 U.S. Dist. LEXIS 13408 (N.D. Ill. Aug. 23, 1999)..............6

SEC v. Warde, 151 F.3d 42 (2d Cir. 1998)....................................................................11

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

—————————————————————————

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES** | : | |
| **AND EXCHANGE COMMISSION,** | : | |
| | : | **CASE NO.  1:10-cv-00955** |
| **Plaintiff,** | : | |
| | : | **Hon.  John W. Darrah** |
| **v.** | : | |
| | : | **Magistrate Judge Susan E. Cox** |
| **GERALD D. HORN,** | : | |
| | : | |
| **Defendant.** | : | |

—————————————————————————

## SEC'S OPPOSITION TO DEFENDANT HORN'S
## MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

Plaintiff Securities and Exchange Commission ("SEC") respectfully files this Opposition to Defendant Horn's July 27, 2010 Motion for Summary Judgment (Docket No. 25, "Motion"). The Defendant claims that Summary Judgment should be granted against the SEC because the SEC "has no *direct* evidence that Dr. Horn possessed any nonpublic information or, indeed any *direct* evidence that he accessed any [Eyes by Laser] report." Motion at 2 (emphasis added).  In short, the Defendant is attempting to create an entirely new – and nonexistent – summary judgment standard in which the SEC would be expected to produce direct evidence of every factual element of its claims.  Such a standard would nullify completely the use of circumstantial evidence and all reasonable inferences, time honored and Supreme Court sanctioned practices, and, in effect, require a confession by the Defendant.  As a result, the SEC respectfully asks this Court to deny the Defendant's Motion.

Defendant Horn never bet incorrectly in his four options trades, risking over a million dollars in options premiums, despite his self-professed conservative approach to investing. Defendant Horn had the opportunity to review Eyes by Laser reports at any time while at LCA facilities.  These reports contained valuable and material nonpublic information about LCA's performance.  Defendant Horn's purported innocent explanations as to his trades are internally inconsistent, equivocal, and inconsistent with other facts, and as a whole are not credible.  A reasonable jury can infer from the totality of this and other evidence that the Horn reviewed Eyes by Laser reports around the time of his trades and committed insider trading.

The Defendant ignores well-settled law that the SEC is entitled to prove its case through the use of circumstantial evidence as well as direct evidence.  The reality is that direct evidence is rarely available in insider trading cases.  The SEC has ample direct and circumstantial evidence from which a reasonable jury could infer that the Defendant traded on nonpublic information, and that he did so with scienter – including, among other things, the Defendant's equivocal and inconsistent testimony, the size and timing of his trades, and various other facts. *See, e.g.,* Michalic v. Cleveland Tankers Inc., 364 U.S. 325, 330 (1960) (circumstantial evidence is not only sufficient but may also be more certain, satisfying and persuasive than direct evidence).  Nothing more is needed to survive a summary judgment motion.

## II.    The Issue for Summary Judgment

Defendant Horn's Motion is predicated on a single issue: whether the SEC has evidence to prove that Horn possessed nonpublic information.  The Defendant does not refute that he ***had access to*** the nonpublic information at issue, i.e. that he had an opportunity to possess it.[1]  The sole issue the Defendant raises for ruling on summary judgment is whether the SEC has

---

[1]      At no point in his Motion does the Defendant deny that he had access to the Eyes by Laser reports.  Moreover, he characterizes the SEC's evidence against himself as describing "a person who had a smattering of successful trades and mere 'access' to certain information."  Motion at 4.

sufficient evidence to prove that Horn exercised this opportunity and ***did in fact possess*** that

nonpublic information.  *See* Motion *generally*.  In addition, as noted below, Defendant Horn

explicitly states that his Motion does not raise the issue of materiality.  *See* Motion at 2 ("This

Motion does not raise the issue of 'materiality,' and thus it assumes without conceding that as of

a given date, [Eyes by Laser] reports might contain material, nonpublic information.").  Thus, the

SEC must only demonstrate in its Response that (1) it has evidence that could be used to show

that Defendant Horn did in fact access and review the Eyes by Laser reports accessible to him on

LCA work computers and thus that he possessed the nonpublic information contained therein,

and (2) this evidence meets the standards for defeating summary judgment.  As shown below, the

SEC succeeds on both fronts.

## III.    Summary Judgment Standard

Summary judgment is only appropriate "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact and that the moving party is entitled to a judgment as a matter of

law."  FED. R. CIV. P. 56(c).  The materiality of a fact is judged according to the substantive law

governing the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   In assessing a

summary judgment motion, the Court should credit the evidence of the nonmoving party, and

draw all reasonable inferences in that party's favor.  Id. at 255; Lesch v. Crown Cork & Seal,

Co., 282 F.3d 467, 471 (7th Cir. 2002).  At the summary judgment stage, a court's function is not

to weigh the evidence and determine the truth of the matter, but to determine whether there is a

genuine issue for trial.  *See* Anderson, 477 U.S. at 255.

In making a decision on summary judgment, all ambiguities and reasonable inferences

must be drawn against the moving party – against Defendant Horn.  Matsushita Electrical

Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  A court cannot grant summary judgment if "the court must make 'a choice of inferences' arising from undisputed facts. . . .   The choice between reasonable inferences from facts is a function of the fact-finder, and when reasonable inferences exist on a genuine issue of material fact, summary judgment will not be appropriate."  SEC v. Roszak, 495 F. Supp. 2d 875, 880 (N.D. Ill. 2007) (internal citations omitted).  In short, "the court cannot decide credibility of witnesses or weigh the evidence." Id.

Proposing an innocent explanation behind the trades at issue is not sufficient to obtain Summary Judgment.  *See* id. at 887 ("While this series of events may—as Defendant Michel argues—have an entirely innocent explanation, at this stage the Court must draw all inferences in the SEC's favor").  In other words, unless this Court finds that no reasonable factfinder could draw any of the SEC's proposed inferences set forth below, the Court must deny the Defendant's Motion.

## IV.     What the SEC must establish to prove its insider trading claims against Defendant Horn

In order for Defendant Horn to be found liable for insider trading under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, the SEC must prove that he traded in the securities of LCA Vision, Inc. ("LCA") on the basis of material, non-public information.  U.S. v. O'Hagan, 521 U.S. 642, 651 (8th Cir. 1997).  Materiality is defined as information that a reasonable investor would view as altering the "total mix" of information made available about the investment.  *See* Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).[2]  Trading on such information qualifies as "deceptive device" because "a

---

[2]     Defendant Horn explicitly states that his Motion does not raise the issue of materiality but still makes a halfhearted claim that the Eyes by Laser reports did not contain material information because they did not include all revenue and expense information about the company.  *See* Motion at 2, 10.  LCA Vision is a company whose revenue is derived primarily from surgical operations.  The nonpublic information Defendant Horn is alleged to have used is the number of surgical operations conducted per

relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." Chiarella v. U.S., 445 U.S. 222, 228 (1980). This relationship "gives rise to a duty to disclose [or to abstain from trading] because of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of the uninformed . . . stockholders.'" Id. at 228-229.

The standard of proof in this case is preponderance of the evidence - that it is merely "more likely than not" that a violation occurred. SEC v. Adler, 137 F.3d 1325, 1343 n. 48 (11th Cir. 1998) (citation omitted). To prove a violation of Section 10(b) and Rule 10b-5, the SEC must show that the defendant acted with scienter. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976).

The Defendant does not refute that he had the opportunity to possess nonpublic information – the information contained in the Eyes by Laser reports. The sole issue raised by the Defendant for consideration on summary judgment is whether the SEC has sufficient evidence that he exercised this opportunity and in fact possessed that information. *See* Motion *generally.* The SEC alleges that the Defendant reviewed Eyes by Laser Reports available to him at LCA. SEC's Statement of Additional Facts at ¶ 1.[3] These reports contained valuable nonpublic information about LCA's sole source of revenue: surgical operations. Id. at ¶ 3.

At the bottom left corner of each Eyes by Laser report is reported the total number of operations ("eyes") performed quarter-to-date by the entire company ("LASIKPLUS") as well as the revenue figures for the entire company ("Revenue"). *See* id. at ¶ 4, *see also* Exhibit 9 to

---

quarter. Such information is clearly relevant to company's revenues and in turn the value of stock of the company and thus material under Basic v. Levinson.

[3] In support of this Opposition, the SEC has attached a Statement of Additional Facts Pursuant to Local Rule 56.1(b)(3)(c) Requiring the Denial of Summary Judgment ("SEC's Statement of Additional Facts") and various other exhibits.

SEC's Opposing Materials (Eyes by Laser reports as of the dates of the Defendant's trades). As a result, Eyes by Laser Reports could enable one to predict with great certainty whether LCA's stock price was likely to rise or fall once that nonpublic information about surgical operations became public as part of LCA's quarterly earnings announcements.

The Defendant claims that to survive summary judgment, the SEC must prove exactly when and how Defendant Horn obtained the nonpublic information. For example, the Defendant protests that the SEC is unable to specifically identify for each of his six options trades the specific time of day that Horn accessed the Eyes by Laser report and the specific LCA computer from which he accessed the report. Motion at 2. Despite the Defendant's objections, there is no requirement that the SEC establish such details.

For example, in SEC v. Van Wagner, the court denied the defendants' motions for summary judgment because the SEC suggested various opportunities that the defendant had to possess the nonpublic information at issue, from which a jury could reasonably infer that the defendant in fact took advantage of one or more of those opportunities to become privy to the nonpublic information. 1999 U.S. Dist. LEXIS 13408 at *6 (N.D. Ill. Aug. 23, 1999). Here, Defendant Horn had the opportunity to review the Eyes by Laser reports at any time, and he was witnessed routinely using the computers on which those reports were available. *See* SEC's Statement of Additional Facts at ¶¶ 3, 5, 6. In addition, in Van Wagner, both parties agreed that the defendant was in Denver during certain meetings, but the SEC had no direct evidence that the defendant attended a particular critical portion of the meeting. 1999 U.S. Dist. LEXIS 13408 at *6. Despite this lack of direct evidence that the defendant was present, the court nevertheless agreed with the SEC that the jury was permitted to infer that the defendant was privy to the conversations at issue. Id. at *7.

Thus, in this case, a jury need only be able to infer – by a mere preponderance standard – that Horn reviewed the Eyes by Laser reports at some point before his trades, and thus that he possessed the information contained in those reports. The SEC has produced to the Defendant Eyes by Laser reports for the days of the Horn's trades in question. *See* Exhibit 9 to SEC's Opposing Materials. These documents support the SEC's allegations in its complaint that the reports the Defendant could have reviewed on or around those dates would have revealed valuable information about LCA's quarterly performance.

A jury could easily infer from the totality of the evidence in this case that it is more likely than not that the Defendant reviewed Eyes by Laser reports on or around the days in question. A jury could also easily infer that the Defendant used that information to predict LCA's quarterly performance and thus to decide whether to purchase calls or puts. Defendant Horn has denied that he used this information, providing alternative explanations for his trades – explanations that are internally inconsistent and inconsistent with the facts. *See* Section VI(A) *infra*.

If a jury draws the inferences proposed by the SEC and finds that Defendant Horn's explanation is not credible, then the SEC will prevail. If the jury finds that Defendant Horn is credible and rejects the inferences proposed by the SEC, Defendant Horn will prevail. In other words, the jury will be asked to weigh the evidence presented by both sides and make a determination as to Defendant Horn's credibility before they can reach a verdict. This simple fact makes summary judgment inappropriate. *See* Roszak, 495 F. Supp. 2d at 880 (in ruling on summary judgment, "the court cannot decide credibility of witnesses or weigh the evidence").

**V.**      **The SEC may prove its case through circumstantial and direct evidence**

The Defendant argues that Summary Judgment should be granted against the SEC because

the SEC "has no ***direct*** evidence that Dr. Horn possessed any nonpublic information or, indeed

any ***direct*** evidence that he accessed any EBL report." Motion at 2 (emphasis added). This is

not the law in this or any circuit. Direct evidence is "[e]vidence that is based on personal

knowledge or observation and that, if true, proves a fact without inference or presumption."

Black's Law Dictionary, Seventh Edition (1999). As explained by John H. Wigmore:

> A little reflection shows that no disputed case will ordinarily be proved solely by
> circumstantial or solely by testimonial evidence. Ordinarily there is evidence of
> *both kinds*. The matter has been obscured by the use of the term "direct evidence,"
> – a term sometimes used to mean testimonial evidence in general, but sometimes
> also limited to apply only to testimony directly asserting the fact-in-issue . . . .
> The term "direct" evidence has no utility."

John H. Wigmore, A Students' Textbook of the Law of Evidence 40 (1935).

Circumstantial evidence, on the other hand, is "evidence based on inference and not on personal

knowledge or observation." Black's Law Dictionary, Seventh Edition (1999). In other

words, circumstantial evidence is "[e]vidence of some collateral fact, from which the existence

or non-existence of some fact in question may be inferred as a probable consequence" William P.

Richardson, The Law of Evidence § 111, at 68 (3d ed. 1928). Thus, any proposed fact other

than those explicitly testified to by persons with personal knowledge of that fact is a fact sought

to be proved through circumstantial evidence.

Because of the difficulty inherent in proving a defendant's mental state in a securities

fraud case, the Supreme Court has observed that "the proof of scienter required in fraud cases is

often a matter of inference from circumstantial evidence… We have noted elsewhere that

***circumstantial evidence can be more than sufficient***." Herman & MacLean v. Huddleston, 459

U.S. 375, 390 n.30 (1983)(emphasis added), *see* Michaels v. Michaels, 767 F.2d 1185, 1199 (7th

Cir. 1985) (scienter can be inferred from circumstantial evidence in an insider trading case); SEC v. Sargent, 229 F.3d 68, 75 (1st Cir. 2000) ("[A] plaintiff is not required to produce direct evidence: 'circumstantial evidence, if it meets all the other criteria of admissibility, is just as appropriate as direct evidence and is entitled to be given whatever weight the jury deems it should be given under the circumstances within which it unfolds.'"). *See also* Roszak, 495 F. Supp. 2d at 886 ("Courts in this District and elsewhere have held that ***the SEC is entitled to prove its case through circumstantial evidence***") (emphasis added). The reality is that "direct evidence is rarely available in insider trading cases." Id. *See also* id. at 887 ("[C]ircumstantial evidence is sufficient to prove insider trading without a direct confession from either the tippee or tipper") (citing SEC v. Van Wagner, 1999 U.S. Dist. LEXIS 13408 (N.D. Ill. Aug. 23, 1999)).

Circumstantial evidence is considered co-equal to direct evidence in proving securities fraud. *See, e.g.,* Michalic, 364 U.S. at 330 (circumstantial evidence is not only sufficient but may also be more certain, satisfying and persuasive than direct evidence); Roszak, 495 F.Supp.2d 875. A variety of facts can be drawn upon to create an inference that insider trading took place. For example, in Roszak, the Court specifically found that "opportunity in combination with circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades creates a compelling inference of insider trading." Roszak, 495 F. Supp. 2d at 890 (quoting U.S. v. Larrabee, 240 F.3d 18, 21 (1st Cir. 2001)). The Court also rejected that a combination of various circumstantial evidence was "speculation" or "strained inferences." Id. Finally, the Court noted that "[w]hether to accept Defendant's innocent version of events is a decision that must be left to the trier of fact." Id.

The Defendant relies primarily on SEC v. Truong, 98 F.Supp.2d 1086 (N.D. Cal. 2000) for the proposition that the SEC cannot rely on pure speculation that the Defendant obtained

nonpublic information.  *See* Motion at 5-7.  In <u>Truong</u>, the Northern District of California granted summary judgment because the SEC had no direct <u>or</u> circumstantial evidence that Truong even had the <u>opportunity</u> to obtain the nonpublic information at issue.  <u>Truong</u>, 98 F.Supp.2d at 1089.  In this case, however – as shown below – the SEC has direct evidence that the Defendant had the opportunity to obtain the nonpublic information contained in the Eyes by Laser Reports, and substantial circumstantial evidence that the Defendant did in fact review those reports.  Indeed, the Defendant does not even dispute that he had the opportunity to review the Eyes by Laser Reports.  Thus, the SEC relies not on speculation, but rather, as described by this District, evidence of "opportunity in combination with circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades." <u>Roszak</u>, 495 F. Supp. 2d at 890.

The Defendant boldly claims that the SEC only has evidence of "a smattering of successful trades and mere 'access' to certain information, with ***no evidence whatsoever*** that the information was actually possessed, much less used."  Motion at 4 (emphasis added).  This is false.  As the Defendant's counsel well knows, every case brought by the SEC – or <u>any</u> plaintiff for that matter – is routinely proven through a combination of direct and circumstantial evidence.  Short of a confession by the Defendant, the SEC could never prove the conduct and scienter necessary to establish a violation of the antifraud provisions of the federal securities laws without the use of inferences drawn from other evidence.

The Defendant's argument contradicts not only established law, but also common sense and logic.  For example, suppose that the SEC produced a witness who testified that he stood over Defendant Horn's shoulder and watched as Horn reviewed an Eyes by Laser report on an LCA computer and then immediately called his broker to purchase LCA options.  Under the

Defendant's theory, the SEC would still lose this summary judgment motion because that witness would be unable to testify as to which part of the report Defendant Horn's eyeballs were directed – the SEC would still have no direct evidence that Defendant Horn reviewed the number at the bottom left hand corner of that report, which provides the number of surgeries LCA had completed to date. *See* SEC's Statement of Additional Facts at ¶ 4. Moreover, under the Defendant's argument, the SEC's case would also fail because that witness has no personal knowledge as to Defendant Horn's mental state – his scienter – at the time of his trades. The reality is that short of a confession, the SEC can never provide direct evidence of every element of insider trading charges. Of course, the Defendant's argument is not the law, and the SEC is permitted to prove its case through both direct and circumstantial evidence, including inferences drawn from other facts. In this case, the SEC has ample circumstantial evidence that Dr. Horn possessed nonpublic information, as demonstrated below.

## VI.     **A factfinder could draw a compelling inference from various facts in this case that the Defendant engaged in insider trading**

Numerous courts have found that a factfinder can draw an inference that insider trading has occurred from a variety of circumstantial evidence. For example, as noted above, in Roszak this district stated that "circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades' creates a compelling inference that insider trading occurred." 495 F. Supp. 2d at 890 (quoting U.S. v. Larrabee, 240 F.3d 18, 21–22 (1st Cir. 2001)). *See also* SEC v. Warde, 151 F.3d 42, 47–48 (2d Cir. 1998) (defendant's access to insider information, coupled w/ pattern of phone calls and stock purchases, provided sufficient evidence of insider trading to support jury verdict); Sargent, 229 F.3d at 74–75 (Holding that the jury could have reasonably inferred defendant possessed material, non-public information from timing and amount of trades and defendant's evasive explanation for stock purchases). As

detailed below, a factfinder could infer that insider trading occurred from a variety of uncontested facts in this case.

      **A.**    **The Defendant's explanations for his trades were both internally inconsistent and inconsistent with the facts; a factfinder could draw an inference from this that he engaged in insider trading.**

A defendant's equivocal or inconsistent testimony can create an inference that the defendant engaged in insider trading. *See, e.g.*, SEC v. Michel, 521 F. Supp. 2d 795, 823 (N.D. Ill. 2007) (in reaching the conclusion that defendants committed insider trading, "the Court considers the equivocal testimony of [defendants] about what they discussed during the January 8 flight . . . The Court also considers that [defendants] and tippees provided shifting, contradictory, and implausible or inadequate explanations for [their trades]"), Howard v. BP Oil, Co., 32 F.3d 520, 526 (11th Cir. 1994) ("the identification of inconsistencies in the defendant's testimony is evidence of pretext. Thus, the identification of a defendant's inconsistent statements has evidentiary value") (citations omitted). Here, Defendant Horn's testimony before the SEC was both internally inconsistent and inconsistent with the facts.

As an initial matter, Defendant Horn's testimony about why he purchased puts in December 2005 – thus betting that the price of LCA's stock would fall – shifted. At first, Defendant Horn testified that his intent was to hedge against his stock options in LCA, in case the price of LCA's stock fell and rendered those stock options worthless. Horn testified:

> "After I talked to [my broker] last December and I said look, I have all these stock options and I'm sort of nervous because I'm sitting on these options, the stock goes down, you know, my profit's paper profit right now, what about taking some position to protect myself if the stock goes down?"

*See* SEC's Statement of Additional Facts at ¶ 9. However, a reasonable jury could conclude that Defendant Horn's claim that he was attempting to hedge his stock options grants is not plausible since his grants did not expire for many years and his puts always expired within mere months.

*See* id.  A jury using common sense could find that a four-month put option does not hedge, for

example, an eight-year stock option and thus conclude that this explanation is not credible.

Later in his testimony, however, Defendant Horn provided a different explanation,

testifying that his trades in LCA options were based solely on historical patterns in the price of

LCA stock, which he noticed through his research of the company.  *See* SEC's Statement of

Additional Facts at ¶¶ 10, 11.  Specifically, Defendant Horn testified that according to his

research of historical price movement, the price of LCA stock went up after the quarterly

earnings announcement made after the close of every first quarter.[4]  *See* id. at ¶ 13.  Defendant

Horn further testified that according to his research of historical price movement, the price of

LCA stock went down after the quarterly earnings announcement after the close of every second

quarter.  *See* id. at ¶ 14.  Defendant Horn further testified that according to his research of

historical price movement, the price of LCA stock went up after the quarterly earnings

announcement after the close of every third quarter.  *See* id. at ¶ 15.  Finally, Defendant Horn

testified that there was no particular pattern to the price of LCA stock as to the fourth quarter.

*See* id. at ¶ 17.

Defendant Horn claimed to have meticulously tracked these price patterns, which he

recorded on a chart he created on his computer.  *See* id. at ¶ 10.  However, he contradicted this

testimony by later stating that in fact he may not have even begun charting LCA's historical

stock price until the third quarter of 2006, when his final trade occurred.  *See* id. at ¶ 16.

Defendant Horn's purchases of puts in August 2006 – bets that the price of LCA's stock

would drop as a result of the third quarter's earnings results – are inconsistent with the purported

historical price pattern to which Horn testified.  If Defendant Horn had in fact traded consistent

---

[4]	During Defendant Horn's 2008 testimony, he backed off from this purported pattern, saying "I
am not positive that Q1 will be great."  *See* SEC's Statement of Additional Facts at ¶ 13.

to his research results – which he testified he always did – he would have bet that LCA's stock would rise after the third quarter earnings announcement, and thus he would have purchased calls. Had he done so, he would have lost nearly $400,000. Instead, Defendant Horn traded in contradiction with the historical pattern of LCA's stock and purchased puts, earning a profit of $255,372 on an investment of $390,477. Defendant Horn thus did not even trade in a manner consistent with the purported pattern he claimed to be following.

Defendant Horn's explanation as to whether he was trading consistent with a pattern shifted as well. During his 2006 testimony, Defendant Horn testified that his strategy was to invest until his purported pattern was broken. *See* SEC's Statement of Additional Facts at ¶ 11. However, Horn later contradicted this, stating that, once he had bet successfully a few times, he felt that he could take some risk, stating that even if his historical pattern had been broken, he would keep trading until he lost money on a trade. *See* id. at ¶ 12. In reality, Horn stopped trading only when the SEC asked him to appear for voluntary testimony in September 2006.

Furthermore, Defendant Horn's description of the historical price pattern of LCA stock – which he was purportedly following when he made his trades – was inconsistent with actual price changes in LCA stock. Specifically, Defendant Horn's testimony that the price of LCA stock went down after the quarterly earnings announcement after the close of every second quarter is inconsistent with actual historical price patterns. In the three previous years preceding Defendant Horn's trades, the price of LCA's stock increased after the second quarter earnings announcements were released. *See* id. *at ¶* 14 and Exhibit 15. Had Horn traded consistent with the actual historical pattern of LCA's stock price, he would have lost nearly $300,000. Instead, he traded against history, and made $295,252 in profit on an investment of $290,792. In short, Defendant Horn's testimony regarding historical patterns in the price of LCA's stock as to

14

second quarter earnings is contradicted by the facts. Because Defendant Horn's explanations for his trades were shifting, contradictory and implausible, a factfinder could infer that Defendant Horn's trades were based on nonpublic information.

Finally, Defendant Horn claimed that he was unable to review the Eyes by Laser reports because a specific password was required to access them, and he did not have such a password:

> Q: Do you ever review the computer to look at information about number of procedures that have been performed?
>
> A: Not only do I not do that, okay, I'm honestly not sure how I would correlate that information and I need a user name and password, which when you look, if you look at the computers at our centers, I've never been on it. I don't even have a user name and password.

Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 116-17. In 2008, Defendant Horn gave similar testimony:

> Q: Do you know what I'm talking about, when I talk about the LCA intranet?
>
> A: Well, the, the, the place where reports come from on the company's computer that has a user name and a password, I have not ever wanted to go on. And to my knowledge, I never had a working user name or password and have never been on that place, nor have I wanted to go on that place.

Exhibit 7, 2008 Gerald Horn Testimony Transcript, at 209. This is false; no password was required to access the Eyes by Laser reports once a user is logged into the computer, which has a simple password known to all users named after the facility. Horn admitted that he had access to computers at the LCA facilities:

> A: in order to get on the computer in the first place, you have to type in something.
> Q: What do you type in, when you want to get on the computer?
> A: Oak Brook, be that the center name and the center password.
> Q: And what's the center password?
> A: They change it. Like right now, it's team, team ob7.
> ### 
> Q: And how do you find out that they've changed it?
> A: Well, if I want to get in the computer, I ask them what it is.

Id. at 210.  After logging into the computer, any user could simply click on the "Eyes by Laser report" icon to review the reports without any additional login or password information.  *See* SEC's Statement of Additional Facts at ¶ 3.

As outlined above, a jury could easily infer from Defendant Horn's equivocal and inconsistent testimony – which was both internally inconsistent and inconsistent with the facts – that it is more likely than not that he engaged in insider trading.

**B.**     **Eyes by Laser Reports were openly posted in at least two of the three facilities where Defendant Horn worked.**

According to two of the directors of the LCA facilities where Defendant Horn worked, printed copies of Eyes by Laser reports were routinely posted in their facilities.  *See* SEC's Statement of Additional Facts at ¶ 1.  In particular, Allison Foster testified that she printed copies of the Eyes by Laser reports and posted them in the break room of the Schaumburg LCA facility a couple of times per week.  Id.  Maria Moreno testified that she routinely printed copies of the Eyes by Laser reports and taped them to a board in the break room of the Oak Brook LCA facility once per week.  Id.  Defendant Horn routinely worked in both the Schaumburg and Oak Brook LCA facilities.  Id.  Thus, a reasonable jury could infer that Horn reviewed those printed copies of the Eyes by Laser reports at his convenience, and thus possessed the nonpublic information listed in those reports.

**C.**     **A factfinder could draw an inference from numerous other facts that Defendant Horn engaged in insider trading.**

There are numerous other facts in this case from which a jury could draw a reasonable inference that Defendant Horn engaged in insider trading.  First, Defendant Horn violated LCA's trading policy, which prohibited all trading in LCA options by employees.  *See* SEC's Statement

of Additional Facts at ¶ 7.  Defendant Horn claimed to be unaware of this policy.  Id.  As noted

above, it is left to the jury to determine if this denial is credible.

In addition, Defendant Horn testified that he was very conservative in his investments,

stating that he is "not a gambler by nature" and that "I believe in the historical pricing but I don't

believe in just risking money."  Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 44-45,

Exhibit 7, 2008 Gerald Horn Testimony Transcript, at 94.  Despite this, he risked nearly $1

million in options premiums on his bets.  When Defendant Horn made his bets, rather than acting

conservatively, his options purchases in fact constituted the vast majority of the market in LCA

options.  For example, Horn's purchases of LCA options on April 5, April 6, June 2, and August

17, 2006 constituted 32%, 68%, 95%, and 36% of all trading activity in LCA options,

respectively, on those days.

Moreover, Defendant Horn was never wrong on his sizable bets on LCA options, betting

correctly four times in a row.  In his Motion, Defendant Horn downplays the significance of

betting correctly four times in a row, stating in his Statement of Uncontested Facts, "A success

run of 4 or 5 trade [sic] in a row is neither uncommon nor suspicious."  See Defendant's

Statement of Uncontested Facts at ¶ 29.  However, this claim is undermined by the exhibit cited

by the Defendant for this very proposition.  That exhibit, Exhibit 21 to Defendant's Statement of

Uncontested Facts, states that the probability of a "run" of four successful random trades in a

row is only 6.25%.  See page 2.  As noted above, the SEC must only prove its case by a

preponderance of the evidence – that it is "more likely than not" that the Defendant committed

insider trading.

In addition to the facts outlined above, precedent in this and other circuits permits a

factfinder to draw an inference from the timing and size of the Defendant's trades that he

engaged in insider trading. *See, e.g.*, <u>Michel</u>, 521 F. Supp. 2d at 823 ("[the defendant] acted on

that same information to buy large amounts of Blue Rhino stock in an unusually short period of

time."); <u>Sargent</u>, 229 F.3d at 74–75 (the jury could have reasonably inferred defendant possessed

material, non-public information from timing and amount of trades and defendant's evasive

explanation for stock purchases); <u>id.</u> at 75 ("After resolving all doubts and credibility issues in

favor of the Commission, we conclude that a jury could reasonably infer from this evidence that

Sargent was operating on more than just a hunch and that he received nonpublic information").

Here, Defendant Horn, who is not a professional investor, spent $1,091,397 on options

premiums on four trades in consecutive quarters, from which he made a total of $869,629 in

profit.  Not only did Horn bet over a million dollars that he knew what direction LCA's stock

price would move, but his profit margins were very high.  For an admitted novice at options

trading, this is an extraordinary result.  As Defendant Horn apparently concedes, there is only a

6.25% chance of this occurring.  A jury could infer from these facts that Defendant Horn had

more than a hunch and some (inconsistent) research behind his bets – he instead obtained

nonpublic information about LCA's operations that allowed him to predict with great certainty

LCA's quarterly performance.

**VII.** <u>**Conclusion**</u>

The Defendant seeks Summary Judgment on the sole basis that, as is common in insider

trading cases, the SEC has no witness who specifically saw the Defendant review the Eyes by

Laser Reports, and Defendant Horn has not admitted possessing any nonpublic information.  By

demanding such evidence, the Defendant is attempting to create an entirely new – and

nonexistent – summary judgment standard in which the SEC is apparently expected to produce

direct evidence of every factual element of its claims.  Such a standard would in effect require

nothing less than a confession from the Defendant.  As detailed above, the SEC has ample direct

and circumstantial evidence from which a reasonable jury could infer that the Defendant is

traded on nonpublic information, and that he did so with scienter.  Nothing more is needed to

survive a summary judgment motion.  As a result, the SEC respectfully asks this Court to deny

the Defendant's Motion.

<div style="margin-left: 40%;">

Respectfully submitted,

s/ Robin Andrews
Robin Andrews, IL Bar No. 6285644
Gregory von Schaumburg, IL Bar No. 3127782
Attorneys for Plaintiff
U.S. SECURITIES AND
EXCHANGE COMMISSION
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390
</div>

Dated:  September 10, 2010