UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | CASE NO. 1:10-cv-00955 |
| | Hon. John W. Darrah |
| v. | |
| | Magistrate Judge Susan E. Cox |
| GERALD D. HORN, | |
| Defendant. | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS PURSUANT TO LOCAL RULE 56.1(b)(3)(C)

Defendant, Dr. Gerald Horn, for his Response to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts, states:

1. Defendant Horn had access to non-public, confidential information about LCA's revenues through a number of different sources. Eyes-By-Laser Reports were posted in at least two of the three LCA facilities where Horn worked. In particular, Allison Foster testified that she printed copies of the Eyes by Laser reports and posted them in the break room of the Schaumburg LCA facility a couple of times per week. *See* Exhibit 3, Allison Foster Testimony, at 25-26. Maria Moreno testified that she routinely printed copies of the Eyes by Laser reports and taped them to a board in the break room of the Oak Brook LCA facility once per week. *See* Exhibit 4, Maria Moreno testimony transcript, at 22-24. Defendant Horn routinely worked in both the Schaumburg and Oak Brook LCA facilities. *See* Exhibit 5, Jodi Mitchell Testimony Transcript, at 99-100. Eyes-By-Laser Reports were also passed out at meetings Horn and other LCA doctors attended. *See* Exhibit 3, Allison Foster Testimony, at 30-32.

**Response:**

Dr. Horn admits that the cited deponents testified that Eyes by Laser reports were posted in the break room at LCA facilities, although there has been no testimony from anyone as to which particular Eyes by Laser reports were in fact posted or on what dates. Dr.

1

Horn denies that he ever possessed or consulted Eyes by Laser reports. (See Opening Motion at 2; Horn Local Rule 56.1(a)(3)Statements 15-16, 19). Dr. Horn admits that he worked at the Schaumburg and Oak Brook LCA facilities. The statement that "Eyes by Laser Reports were also passed out at meetings Horn and other LCA doctors attended," is denied, because the cited testimony of Alison Foster does not support this. It refers merely to meetings being attended by "doctors" and denies that this meant *all* of the doctors. Rather, she said it was "whoever was in the Center at the day of the meeting," (Foster Dep 31, SEC Exhibit 3) and that these meetings only occurred "maybe once every couple of months." (Foster Dep 30, SEC Exhibit 3)

2. Defendant Horn admitted that he both saw and paid attention to reports which contained information about operations performed with different types of lasers. *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 120-21. Horn stated that certain reports frequently were just left open on computer screens, after the individual that initially opened them had walked away, and that he saw those. *See* Exhibit 7, 2008 Gerald Horn Testimony Transcript, at 202-03.

**Response:**

The first sentence of paragraph 2 is not supported by the cited testimony and thus it is denied. Dr. Horn admits that at the page cited by the SEC from his 2006 deposition, he testified that he had seen "pages showing the Chicago percentage by laser. What percentage of, I'm using the Bausch & Lomb, what percentage of Elcon." (Horn Dep. SEC Exhibit 6 at 120-21). At those same pages, Dr. Horn denied ever having seen the Eyes by Laser report he was shown or anything like it. Dr. Horn admits the second sentence of SEC statement 2, although he adds that at the cited pages, he testified that he did not know what kind of "reports" these were that had been left on the screen by others. (Horn Dep., SEC Exhibit 7 at 203).

2

3. LCA employees testified that the only thing necessary to reach the LCA intranet website, where the Eyes by Laser reports were maintained, was to type in the name of the LCA facility (e.g., "Oakbrook.com") and a common password that everyone knew. After logging into the computer, any user could simply click on the "Eyes by Laser report" icon to review the reports. *See, e.g.*, Exhibit 3, Allison Foster Testimony Transcript, at 16-17, Exhibit 4, Maria Moreno Testimony Transcript, at 16-22, Exhibit 5, Jodi Mitchell Testimony Transcript, at 23-26, 47, and 68, and Exhibit 8, Juan Bojorquez Testimony Transcript, at 16.

**Response:**

Denied. The cited testimony reflects only the knowledge and perception of the deponents about how certain information could be accessed. They cannot speak to others' knowledge, including whether "everyone" knew the common password or if that was all that was required. Rule 602, Federal Rules of Evidence. Indeed, Like Dr. Horn, Drs. Bertucci and Simon believed that a special password was needed to access EBL reports on the computer. (Bertucci Dep. 81, Horn Exhibit 28; Simon Dep. 12, Horn Exhibit 29). Juan Bojorquez believed that LCA Center directors, like himself, needed "their own log in name and their password" to access EBL reports. (Bojorquez Dep., SEC Exhibit 8 at 14-15). Chip Skidmore, LCA's assistant general counsel, likewise told the SEC that there were different levels of information available on the computer, and that each required a separate user id and password. (Horn Exhibit 25, August 24, 2006 letter).

4. LCA provided the SEC with the Eyes by Laser reports as they existed on the days of each of Defendant Horn's options trades. *See* Exhibit 9. At the bottom left corner of each Eyes by Laser report is reported the total number of operations ("eyes") performed quarter-to-date by the entire company ("LASIKPLUS") as well as the revenue figures for the entire company ("Revenue"). *See* Exhibit 10 (Testimony Exhibit 10) and Exhibit 5, Jodi Mitchell Testimony Transcript, at 46-52. These reports also contained information about operations performed with different types of lasers. Id.

**Response:**

3

Dr. Horn is without knowledge or information concerning the source of Exhibit 9 or their authenticity. While Dr. Horn had not seen Eyes by Laser reports before being shown one in his deposition, (Horn Dep. SEC Exhibit 6 at 120-21), he admits that the documents that comprise Exhibit 9 facially appear the show the information described in SEC statement 4 and that this is supported by the referenced testimony of Jodi Mitchell.

5. Horn admitted that he could and did get access to the computers simply by typing in the facility name and then, if he did not know it, asking someone for the common password. *See* Exhibit 7, 2008 Gerald Horn Testimony Transcript, at 210-11. LCA employees frequently witnessed Horn using computers at the facilities. In fact, Horn admitted that he used the LCA computers all the time. *See* id. at 211, Exhibit 3, Allison Foster Testimony Transcript, at 18, and Exhibit 4, Maria Moreno Testimony Transcript, at 26.

   **Response:**

   Admitted.

6. LCA could not track which of its employees used a particular computer at a particular time because all employees could gain access to the computers simply by typing in the facility name and a common password. *See, e.g.,* Exhibit 3, Allison Foster Testimony Transcript, at 17-20. It also appears that Defendant Horn was aware of this fact, going so far as to state that "when you look, if you look at the computers at our centers, I've never been on it." *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 117.

   **Response:**

   Because the cited testimony does not support the first sentence of SEC statement 6, it is denied. Indeed, Ms. Foster was not even asked at the cited pages whether LCA "could" track which of its employees had used a particular computer at a particular time. She did testify at those pages that all employees could and did gain access to the computers. She further testified that one way they could do so was by using a common password.

4

She did not testify that this was the exclusive means of doing so or that if personal password was used, that the company could not "track" that access. The second sentence is not supported by the cited testimony of Dr. Horn, which actually suggests the opposite conclusion. Therefore, it is denied.

7. Effective July 1, 2004, LCA's General Counsel drafted and implemented an Insider Trading Policy applicable to all employees. *See* Exhibit 11 (marked as Testimony Exhibit 7). The Insider Trading Policy expressly stated that "Short selling, or trading in puts, calls and options, with respect to securities of the Company is prohibited." *Id.* at 4 (Item D). Defendant Horn claimed to be unaware of this policy at the time of his trades. *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 14-16.

**Response:**

Admitted. Further answering, other LCA employees were unaware of this policy's provisions concerning the trading of options during the period of Dr. Horn's trading (Brand Dep. 35-36, Horn Exhibit 30; Simon Dep. at 33, Horn Exhibit 29). Until October of 2006, Dr. Boldus believed the only options trading prohibition applied to *incentive* options and that the prohibition only applied during blackout periods. (Boldus Dep. 48-53, Horn Exhibit 31). Dr. Bertucci was unaware of a company policy relating to options trading until May, 2006, and once he was, he interpreted it to allow options trading, just not during blackout periods. (Bertucci Dep. 27-28, 58-65, Horn Exhibit 28). Each of these LCA doctors traded successfully in LCA options. None of them was charged by the SEC. Nor was their credibility in this or any respect challenged by the SEC. (See Motion at 9-10). Jodi Mitchell–LCA's Regional Director, responsible for the Chicago offices and two in Wisconsin–interpreted the policy only to preclude options trading "during the blackout period." (Mitchell Dep., SEC Exhibit 5 at 10, 81-82). Further answering, as discussed in Dr. Horn's Reply, the evidence of LCA's policy concerning the trading of options is irrelevant and inadmissible.

5

8. Horn claimed that if he had wanted to trade, he would have discussed it with LCA in advance and get LCA's permission. *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 15-16. Despite this claim, he did not consult with LCA including any of the attorneys or LCA's investor relations office before his trades. *See* Exhibit 7, 2008 Gerald Horn Testimony Transcript, at 131-132.

**Response:**

Denied. This statement has been lifted out of context. Dr. Horn testified at the cited pages that he had only learned of the options policy two weeks earlier, and that he thus did not know of it when he placed the trades at issue in this case. This testimony followed, which clearly applied to *future* trading in light of that newly acquired knowledge:

"Q: Do you believe *today* that you're covered by the trading policy of LCA-VIsion Lasik Plus?.
A: I think if I wanted to trade, I would, my plan is to discuss this with the company, in advance." (Emphasis supplied).

In the cited pages of his later deposition, Dr. Horn testified that he had not consulted with anyone at LCA about the permissibility of options trading "prior to [his] first option trade." (SEC Exh. 7, Horn 2008 Dep. At 131-32). In light of his unawareness of the policy at that time, his failure to LCA's input or advice was meaningless.

Further answering, Dr. Horn did **contact** John Kiley, the corporate controller of LCA by telephone on a date in March 2006 which was prior to March 13, 2006, regarding the exercise of Dr. Horn's incentive stock options. Mr. Kiley received another telephone call during the week of March 13, 2006 to exercise Dr. Horn's stock options. At that time, John Kiley informed the caller that the Company had stopped processing stock option exercises for all employees due to transition of the Company leadership from Dr. Stephen Joffe to Mr. E. Anthony Woods. (Horn Exhibit 32, July 26, 2006

6

Skidmore letter at p. 2; Horn Exhibit 25, August 24, 2006 Skidmore letter at p. 4, item 6). Dr. Horn's attempted exercise of these options in *March 2006*, conclusively refutes the allegation that he exercised them in May, 2006 because he came into possession of nonpublic information in early May of 2006. (Horn Exhibit 1, SEC Complaint ¶¶78-82).

9. During his 2006 testimony Horn advised the staff that he initially decided to trade options in order to hedge the risk he faced from the fact that he had numerous incentive stock options from LCA. Horn testified:

> "After I talked to [my broker] last December and I said look, I have all these stock options and I'm sort of nervous because I'm sitting on these options, the stock goes down, you know, my profit's paper profit right now, what about taking some position to protect myself if the stock goes down?"

Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 33- 36. *See also* Exhibit 7, 2008 Gerald Horn Testimony Transcript, at 61, 67-69. Defendant Horn's remaining incentive stock options did not even begin expiring until 2009; some had another nine years before they expired. *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 106, Exhibit 12 at 2 (chart under Item 7).

**Response:**

Dr. Horn denies the first sentence in SEC Statement 9 and admits the accuracy of the quote that follows it. He further answers that that as the quote above makes clear, his interest was in protecting himself against a loss due to the fact that his incentive options were immediately exercisable, and he had paper profits in the stock underlying his incentive options. Any decline in the current market price would cause a reduction in the amount of his paper profits. He further answers that an additional reason for his initial option trade was to learn about options trading. (SEC Exh. 6, Horn 2006 Deposition at 48). He further admits that his remaining incentive stock options were not scheduled to expire for some time thereafter, but affirmatively states that they were

7

*immediately exercisable*, which made hedging an appropriate consideration for them.

(See Horn Exhibit 25, August 24, 2006 Letter of Chip Skidmore to SEC at p. 4, ¶7).

10. Horn's second theory for his trading, also provided during his 2006 testimony, was that he traded solely on the basis of historical patterns he saw in the stock. *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 24-25, 43, 46, 64-5. Horn stated that he charted this pattern and consulted it before he made any of his trades. *See* id. at 58-62 and Exhibit 14 (Horn's chart). Horn stated that "I'm not a gambler by nature, I don't go to Las Vegas....It is my personality, if I'm going to have enough money to protect my family then I'm going to do something to get there. That's just my nature. So to the outside world maybe it looks like I'm a risk taker....I always look at, and it's not just with [LCA], as I look at other stocks, the trading pattern gives me a better than, it's not like I'm flipping a coin, I think I have a better than 50/50 shot here at being successful." *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 44-45.

**Response:**

Dr. Horn admits that he traded stock based upon historical patters he saw in the stock, including adjusting his trading if he saw changes in the historical pattern. (Horn 2006 Dep, SEC Exh. 6 at 46-47). Dr. Horn admits that he consulted his charted the patterns he observed and consulted that when he traded. Dr. Horn admits that the quotations in the final seven lines of Statement 10 quote phrases that he used in his deposition. Dr. Horn objects, however, to the ellipses within those quotes, which are significant. In the portions ellipted out, Dr. Horn explained that his trading was not as risky as it appeared to the outside world, because he was trading on the $2 million stock option profits from the prior year, $1.5 million of which he protected by placing it in a hedge fund.. (Horn 2006 Dep, SEC Exh. 6 at 45).

11. Horn stated that he believed so strongly in this pattern that he would stop trading on it the day the pattern broke. *See* id. at 57-8.

    **Response:** Admitted

12. In a later testimony, stated that as long as he was making money, he would continue trading – even if the pattern wasn't working. He did qualify that, however, by saying

8

that he didn't "believe in just risking money" so he would stop trading if he actually lost money. Exhibit 7, 2008 Gerald Horn Testimony Transcript, at 93-94.

**Response:**

Admitted, although Dr. Horn further qualified that he would have stopped trading if he had lost a "significant" amount of money. (Horn 2008 Deposition, SEC Exhibit 7 at 93)

13. Horn testified that according to the historical pattern, LCA's stock price increased every year after LCA announced its first quarter earnings. *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 24-5, 39, 42, 54. In contrast, he testified in 2008 that he was "not positive that Q1 will be great...." Exhibit 7, 2008 Gerald Horn Testimony Transcript, at 75.

**Response:**

Dr. Horn admits that he testified in 2006 that historically, LCA price did increase every year after the first quarter earnings were announced. The snippet of Dr. Horn's 2008 testimony quoted in the balance of Statement 13, that he was "not positive," was not "in contrast" with this earlier testimony. The SEC has omitted the surrounding, commonsense explanation for this qualification: "I'm not 100 percent certain that the world won't fall apart. A new 9/11 could happen. Anything could happen." (Horn 2008 Deposition, SEC Exhibit 7 at 74).

14. Defendant Horn testified that according to his research of historical price movement, LCA's stock price always decreased after LCA announced its second quarter earnings. *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 24-5, 42, 46, 54, 55, 64. This is incorrect: in each of the three previous years, the price of LCA's stock increased on the day the second quarter earnings announcements were released. *See* Exhibit 15, charts downloaded from Nasdaq.com. Horn, however, disregarded the actual historical evidence and purchased puts instead.

**Response:**

Dr. Horn admits the first sentence, with the qualification that he testified that there was a Quarter 2 decrease for "every year that I've been with the company at least going back to *2004*." (Horn 2006 Dep., SEC Exh. 6 at 42). Exhibit 15, which the SEC has attached,

confirms that Dr. Horn was correct, since the charts contained in SEC Exhibit 15 clearly reflect a decrease in LCA stock after the 2d quarter earnings announcements of 2004 and 2005. The fact that there was a momentary increase, i.e. on "the day of the earnings announcement" (SEC Statement 14 n.2) does not alter the fact that the price of LCA stock decreased thereafter, since the downward slope of the attached charts is palpable. Dr. Horn's testimony about expected increases or decreases in stock price was not confined to the "day after" any announcement. Indeed, in the trades charged, he never traded to close his position on the "day after" any of the announcements. (See Horn Exh. 1, SEC Complaint, ¶¶64, 66, 74, 76, 87, 89, 101, 102). Accordingly, Dr. Horn denies the balance of Statement 14, all of which is disproved by SEC Exhibit 15.

15. Defendant Horn testified that according to his research of historical price movement, LCA's stock price <u>increased</u> after the quarterly earnings announcement after the close of every <u>third</u> quarter. *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 46-47. To act consistent with this pattern, Horn should have bought LCA calls. Instead, he purchased LCA puts, in contrast to his historical pattern. Horn testified that "as I became more successful with [trading], I became more speculative. So I started to veer away from my pattern, especially towards the end like Q3 [of 2006]." Exhibit 7, 2008 Gerald Horn Testimony Transcript, at 47.

**Response:**

Dr. Horn denies this statement, because it misstates his testimony and is substantially incomplete. Dr. Horn said only that the stock "third quarter [the stock] *typically* goes up *relative to the second quarter.* ..." He then stated, however, that what he observed "this year" was "*different,*" that it marked "a big change to [him]," and he explained why. (Horn 2006 Dep, SEC Exh. 6 at 46-47). The SEC challenges neither the occurrence of the "big change" nor Dr. Horn's perception or explication of it, all of which accounted for the change in strategy.
10

16. Horn testified in 2006 that the historical pattern was a "more valuable predictor" of stock price "than anything else [he] could find." *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 65. Moreover, in contrast to Horn's 2006 testimony, where he stated that he had no reasons for his trading other than the historical patterns he saw (*see id.* at 25, 43, 49-50), Horn testified in 2008 that in fact he also had traded for reasons of whim, "reacting to the moment" or even with "no rationale, no policy." *See* Exhibit 7, 2008 Gerald Horn Testimony Transcript, at 47-49, 109-10, 122-126. Defendant Horn also stated that in fact he may not even have begun charting LCA's historical stock price until after the second quarter of 2006. *See id.* at 44.

**Response:**

Dr. Horn admits the first sentence of SEC Statement 16. Dr. Horn admits that he made a trade based upon "reacting to the moment," but further answers that this happened only as to a single trade, which had occurred later in his trading after he enjoyed substantial success, thereby allowing him to be more speculative. (SEC Exhibit 7, 2008 Horn Deposition at 47-48). Dr. Horn also admits that there was a single trade in which he described his trading as having been on a "whim" without a "rationale" or "policy." This trade also was very late in Dr. Horn's trading, specifically mid-August, 2006 after he already "had made a lot of money. [He] was just having fun with it. [and] was going to see what happened." (SEC Exhibit 7, 2008 Horn Deposition at 47-48). Indeed, the premium for these calls was only "40cents", *id*, for which Dr. Horn only invested approximately $15,000 (SEC Exhibit 6, Horn 2006 Deposition at 75-76). The insignificance of this trade is demonstrated by the fact that the SEC has not even charged it. (See SEC Complaint, Horn Exhibit 1).

In terms of when Dr. Horn began charting LCA's historical stock price, Dr. Horn denies this aspect of SEC Statement 16, because it is incomplete and inaccurate. Dr. Horn did not squarely say that his charting did not commence until after the second quarter of 2006. Rather, while his memory was understandably vague in his 2008 deposition–two

11

years after the fact–Dr. Horn said that he began charting after the fourth quarter of 2005, perhaps in the first quarter of 2006 or possibly later. (Horn 2008 Deposition, SEC Exh. 7 at 44). Moreover, "tracking" (i.e. following) historical price patterns is not synonymous with converting them to one's own chart. The historical patterns Dr. Horn relied upon and ultimately used for his chart came from on-line charting services that provided this information–information he had been looking at "for a long time." (Horn 2008 Deposition, SEC Exh. 7 at 44-45). Thus, the suggestion that Dr. Horn could not have relied on historical patterns in trading because he may not have yet "charted" them *himself* does not follow, and again omits the balance of Dr. Horn's testimony on this issue

17. Defendant Horn testified that there was no pattern to the price of LCA stock as to the fourth quarter. *See* Exhibit 6, 2006 Gerald Horn Testimony Transcript, at 48.

   **Response:** Admitted.

Respectfully submitted,

/s/Peter B. Shaeffer

/s/Andrew Staes

Law Offices of Peter Shaeffer

30 N. LaSalle Street

Suite 2140

Chicago, IL 60602

(312) 782-5306

13

Staes & Scallan, P.C.

111 W. Washington Street

Suite 1631

Chicago, IL 60602

(312) 201-8969

## CERTIFICATE OF SERVICE

I, Andrew Staes, hereby certify that I have caused Defendant's Response To Plaintiff's Statement Of Additional Facts Pursuant To Local Rule 56.1(b)(3)(3) to be served upon:

Robin Andrews
Gregory Paul Von Schaumburg
SECURITIES & EXCHANGE COMMISSION
175 W. Jackson Street
Suite #900
Chicago, Illinois 60604-2601
*via E.C.F. Notice on October 15, 2010.*

/s/ Andrew Staes
ANDREW STAES