MHN

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ) ) ) | |
| Plaintiff, ) | Case No. 10-cv-955 |
| ) v. ) | Judge John W. Darrah |
| ) GERALD D. HORN, ) ) | |
| Defendant. ) | |

# MEMORANDUM OPINION AND ORDER

The United States Securities and Exchange Commission ("SEC") filed this action against Dr. Gerald D. Horn, alleging that Dr. Horn engaged in insider trading in violation of federal securities laws. Presently before the Court is Dr. Horn's Motion for Summary Judgment.

## BACKGROUND

Unless otherwise specified, the following facts are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1. Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 results in those facts'

being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).[1]

LCA-Vision Inc. ("LCAV") is a NASDAQ-listed company in the business of providing vision-correction services. Dr. Horn is a Doctor of Ophthalmology, who performs laser-vision-correction services at LCAV facilities in the Chicago area. Def. 56.1(a)(3) ¶ 31. According to the SEC, Dr. Horn traded in LCAV stock and options on the basis of nonpublic information contained in LCAV's Eyes-By-Laser reports ("EBL reports"). Def. 56.1(a)(3) ¶ 1.

The SEC alleges Dr. Horn reviewed EBL reports during specific months in order to determine that LCAV was a specified percentage behind or ahead of quarterly targets for surgeries and revenue. *See* Compl. ¶¶ 60, 67, 78, 83, 92. Dr. Horn then allegedly traded on the basis of that information.[2] The SEC, however, does not know which specific EBL reports contain the nonpublic information that allegedly served as the bases for the trades at issue, which specific LCAV computer was used to access those reports, or on which date Dr. Horn obtained or possessed any nonpublic information from an EBL

---

[1] Dr. Horn also submitted a "Supplemental Statement of Uncontested Facts" in connection with his reply brief. Local Rule 56.1 does not provide for any such "supplemental" statements – and with good reason: the Court would have to accept those statements without affording the opposing party an opportunity to respond. Accordingly, these purported facts were not considered in resolving Dr. Horn's motion.

[2] The SEC's Complaint alleges that Dr. Horn made six separate purchases of LCAV put and call options on the basis of material, nonpublic information, resulting in illicit gains of approximately $869,629. Compl. ¶ 1. The SEC also claims Dr. Horn traded on the basis of material, nonpublic information when he decided to exercise LCAV option grants and sell the stock, resulting in a loss avoided of approximately $533,603. *Id.* These trades allegedly took place between December 2005 and August 2006. *Id.* ¶ 4. The SEC's Local Rule 56.1 statements do not provide any factual support for these claims.

report. Def. 56.1(a)(3) ¶¶ 10-11. There is no direct evidence that proves Dr. Horn accessed a computer on a particular day or viewed an EBL report on a date certain. Def. 56.1(a)(3) ¶ 9.

The SEC began its investigation of Dr. Horn's trading on or before June 12, 2006. Def. 56.1(a)(3) ¶ 18. During the course of that investigation, Dr. Horn submitted to two administrative depositions conducted by the SEC – one on September 20, 2006, and one on September 8, 2008. Def. 56.1(a)(3) ¶ 19. Dr. Horn testified that he never accessed EBL reports and that he did not trade in LCAV common stock or listed options on LCAV common stock while in possession of any nonpublic information. Def. 56.1(a)(3) ¶¶ 15, 16.

The SEC also took investigative testimony from at least 14 other individuals, including eight persons who worked with Dr. Horn on a regular basis at Chicago-area LCAV locations. Def. 56.1(a)(3) ¶ 20. Additionally, LCAV provided the SEC with copies of its EBL reports as they existed on the days of each of the trades at issue. Pl. 56.1(a)(3) ¶ 4. Each report shows the total, quarter-to-date number of operations performed by the entire company, as well as company-wide revenue figures. Pl. 56.1(a)(3) ¶ 4. They do not contain any indication of targets.

Despite its investigation, the SEC cannot present any direct evidence that Dr. Horn ever accessed an EBL report or based any trades on information contained in such a report. Def. 56.1(a)(3) ¶¶ 2, 3, 14. Nor has the SEC identified direct evidence of any revenue or surgical-procedure targets made by analysts against which Dr. Horn was allegedly able to compare LCAV's progress. Def. 56.1(a)(3) ¶¶ 12, 13.

3

Instead, the SEC's theory is based primarily on the success of Dr. Horn's trades combined with his *ability* to access LCAV's EBL reports if he had wanted to do so. Certain computers at the LCAV centers were available for use by all employees and were, in fact, used by most employees. Def. 56.1(a)(3) ¶¶ 22, 23. Dr. Horn used LCAV's computers openly, in the plain view of LCAV employees, "all the time." Def. 56.1(a)(3) ¶ 34; Pl. 56.1(a)(3) ¶ 5. The SEC is unaware, however, of any person who ever saw Dr. Horn viewing an EBL report on an LCAV computer. Def. 56.1(a)(3) ¶ 25.

Printed copies of these EBL reports were also posted in at least two of the three LCAV facilities where Dr. Horn worked. Pl. 56.1(a)(3) ¶ 1. Allison Foster testified that she printed copies of the EBL reports and posted them in the break room at the LCAV facility in Schaumburg, Illinois, a couple of times per week. Pl. 56.1(a)(3) ¶ 1. Maria Moreno testified that she routinely printed copies of the EBL reports and taped them to a board in the break room of the LCAV facility in Oak Brook, Illinois, on a weekly basis. Pl. 56.1(a)(3) ¶ 1. Dr. Horn routinely worked at both of these facilities. Pl. 56.1(a)(3) ¶ 1. Dr. Horn had seen reports left open on computer screens by other individuals using the computers, but he was not aware of what kind of reports those were. Pl. 56.1(a)(3) ¶ 2; Def. Resp. to Pl. 56.1(a)(3) ¶ 2.

During his 2006 deposition, Dr. Horn testified that his first purchase of call or put options was made to hedge the risk that his employee-incentive options would decrease in value if the price of LCAV's stock went down and to learn more about options trading. Pl. 56.1(a)(3) ¶ 9; Def. Resp. to Pl. 56.1(a)(3) ¶ 9. At that time (December 2005), his

4

remaining incentive options did not begin expiring until 2009; and some did not expire for another nine years. Pl. 56.1(a)(3) ¶ 9. Dr. Horn further explained his options-trading theory by testifying that he traded on the basis of historical patterns he saw in the stock. Pl. 56.1(a)(3) ¶ 10. Dr. Horn stated that he charted this pattern and consulted it before making any of his trades and that he believed so strongly in this pattern that he would stop trading on it the day the pattern broke. Pl. 56.1(a)(3) ¶¶ 10-11. (He later stated that, even if the pattern was not working, he would continue to trade as long as he was making money. Pl. 56.1(a)(3) ¶ 12.) According to Dr. Horn, the historical pattern of LCAV's stock price showed that it increased every year after LCAV announced its first-quarter earnings. Pl. 56.1(a)(3) ¶ 13. Dr. Horn also testified that his research showed that LCAV's stock price decreased after LCAV announced its second-quarter earnings for every year going back to 2004.[3] Pl. 56.1(a)(3) ¶ 14.

Effective July 1, 2004, LCAV's General Counsel drafted and implemented an "Insider Trading Policy," which was applicable to all employees. Pl. 56.1(a)(3) ¶ 7. That policy expressly prohibits "[s]hort selling, or trading in puts, call and options, with respect to securities of [LCAV]." Pl. 56.1(a)(3) ¶ 7. Dr. Horn claimed to be unaware of

---

[3] In its opposition to Dr. Horn's Motion for Summary Judgment, the SEC submitted charts, purportedly downloaded from Nasdaq.com, and argues – without explanation – that the charts conclusively prove that LCAV's stock historically *increased* on the day the second quarter earnings announcements were released. Pl. 56.1(a)(3) ¶ 14. Dr. Horn responds by arguing that the earnings patterns nonetheless exhibit a general downward trend following the announcement of second-quarter earnings. Def. Resp. to Pl. 56.1(a)(3) ¶ 14. Assuming the date marked with an "E" on the charts is the date that second-quarter earnings were announced, the charts do appear to show a general downward trend in third-quarter earnings relative to second-quarter earnings for 2004 and 2005. However, neither party has submitted facts as to the days LCAV actually issued its earnings announcements or otherwise attempted to explain how the charts should be interpreted.

this policy at the time of the trades at issue, Pl. 56.1(a)(3) ¶ 7, as did several other LCAV doctors, Def. Resp. to Pl. 56.1(a)(3) ¶ 7. Dr. Horn did not consult with anyone at LCAV before conducting his first option trade. Pl. 56.1(a)(3) ¶ 8.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)).

The nonmoving party must go beyond the face of the pleadings to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the nonmoving party's favor. *Nieves v. Bd. of Educ. of the City of Chi.*, 297 F.3d 690, 693 (7th Cir. 2002) (citing *Celotex*, 477 U.S. at 324). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment, nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be

such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

The SEC claims Dr. Horn violated Section 10(b) of the Exchange Act and Rule 10b-5, which provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device scheme or artifice to defraud, [or]
>
> . . .
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.[4] Rule 10b-5 is violated when a person breaches a fiduciary duty to a company by trading in that company's securities on the basis of material, nonpublic

---

[4] In its single-count Complaint against Dr. Horn, the SEC alleged that Dr. Horn violated all three prongs of Rule 10b-5. On April 27, 2010, the Court granted Dr. Horn's motion to dismiss the SEC's claim to the extent it alleged Dr. Horn made any material misstatement or omission pursuant to Rule 10b-5(b). *See* Docket No. 15. Accordingly, only the first and third prongs of Rule 10b-5 remain at issue.

information. *Dirks v. SEC*, 463 U.S. 646, 663 (1983). The SEC must prove its case by a preponderance of the evidence. *See Rowe v. Maremont Corp.*, 850 F.2d 1226, 1234 (7th Cir. 1988).

Dr. Horn raises a single issue in his Motion for Summary Judgment: he argues the SEC cannot present sufficient evidence to show he ever possessed nonpublic information on which he could have based the trades at issue. For purposes of this motion, Dr. Horn has expressly waived any argument as to the materiality of any such information. *See* Def. Mot. for Summ. J. 2 ("This Motion does not raise the issue of 'materiality,' and thus it assumes without conceding that as of a given date, EBL reports might contain material, nonpublic information.").[5]

Although it admits a lack of direct evidence, the SEC contends it can present enough circumstantial evidence to persuade a reasonable jury that Dr. Horn possessed nonpublic information. Direct evidence of insider trading is, indeed, rare; and the SEC is entitled to prove its case through circumstantial evidence. *See, e.g., Michaels v. Michaels*, 767 F.2d 1185, 1199 (7th Cir. 1985) (stating that scienter can be inferred from circumstantial evidence in an insider-trading case); *SEC v. Sargent*, 229 F.3d 68, 75 (1st Cir. 2000) ("[A] plaintiff is not required to produce direct evidence; 'circumstantial evidence, if it meets all the other criteria of admissibility, is just as appropriate as direct evidence and is entitled to be given whatever weight the jury deems it should be given

---

[5] In his Reply Brief, Dr. Horn changes course and argues that the EBL reports are not material. This argument comes too late, and it will not be considered. *Cf. Draine v. Bauman*, 708 F. Supp. 2d 693, 710 (N.D. Ill. 2010) (citing *United States v. Wescott*, 576 F.3d 347, 354 (7th cir. 2009); *Porco v. Trustees of Ind. Univ.*, 453 F.3d 390, 395 (7th Cir. 2006)).

under the circumstances within which it unfolds.'"); *SEC v. Roszak*, 495 F. Supp. 2d 875, 886-87 (N.D. Ill. 2007) (*Roszak*) ("Courts in this district and elsewhere have held that the SEC is entitled to prove its case through circumstantial evidence.") (citations omitted); *SEC v. Van Wagner*, No. 97 C 6826, 1999 WL 691836, at *3-4 (N.D. Ill. Aug. 25, 1999) (*Van Wagner*) ("[C]ircumstantial evidence is sufficient to prove insider trading without a direct confession from either the tippee or tipper.").

In *Roszak*, for example, the court denied the SEC's motion for summary judgment, notwithstanding an absence of direct evidence that the defendant had acquired material, nonpublic information from an insider. *Roszak*, 495 F. Supp. 2d at 888-89. One defendant, Roszak, was acquainted with Andrew Filipowski, a nonparty member of Blue Rhino, Inc.'s board of directors, and owned a significant interest in another of Filipowski's companies. *Id.* at 877. In 2004, when Filipowski knew about a proposed merger between Blue Rhino and another company, Roszak and Filipowski sat next to each other on a two-hour flight to Chicago. *Id.* Two hours after getting off the flight, Roszak called his broker and placed an order for approximately $95,000 of Blue Rhino stock – an amount that was four times larger than any single-day stock purchase he had made during the past year. *Id.* Then, after receiving an email from Filipowski, in which Filipowski informed Roszak that he was busy with daily Blue Rhino meetings, Roszak called four people, all of whom subsequently purchased significant portions of Blue Rhino stock. *Id.* at 877-78. One of those four people, Edgecombe, in turn called four other people, each of whom also purchased Blue Rhino stock shortly thereafter. *Id.* at 878. The SEC filed an action against five of the stock purchasers, four of whom

consented to judgment. *Id.* at 879. The sole remaining defendant (one of Edgecombe's alleged tippees) moved for summary judgment. *Id.*

Although the SEC had no direct evidence that Roszak was given material, nonpublic information about the pending merger and passed it on to others, the court held that the circumstances supported an inference of illegal insider trading sufficient to withstand a motion for summary judgment, stating, "[T]he SEC has put forth sufficient circumstantial evidence to permit a reasonable inference that insider trading occurred. It will be for the trier of fact to decide whether to believe the version of events offered by the SEC or Defendant Michel." *Id.* at 887-88. In so holding, the court also noted that several of the defendants "offered equivocal testimony on numerous points, in some instances claiming a lack of memory about key conversations, and also offering conflicting or implausible explanations for their actions with respect to Blue Rhino stock purchase." *Id.* Based on all of the above, the court held that a trier of fact could reasonably decide to credit the SEC's theory of events. *Id.*

*Van Wagner* similarly involved a situation where numerous associates of an insider made significant stock transactions. One of the defendants, Bruce Van Wagner, served as the chairman of the board of directors of the Antec Corporation. *Van Wagner*, 1999 U.S. Dist. LEXIS 13408, at *2. Antec held a management meeting in Denver, Colorado. *Id.* Van Wagner flew to Denver with other attendees and attended the first day of the meeting for a brief period. *Id.* On the second day of the meeting, Antec executives discussed whether the public should be notified about its earnings. *Id.* at *2-3.

One week later, Antec publicly announced that its earnings would fall short of analysts' expectations; its stock price declined significantly. *Id.* at *3.

In between the second day of the meeting and Antec's earnings announcement, five of Van Wagner's six children and two of his neighbors sold all of their Antec stock. *Id.* All of them had contact with either Van Wagner or his wife during that time period. *Id.* at *10. Although Van Wagner was in Denver for the second day of the meeting, he did not attend. *Id.* at *5-6. The court nonetheless determined that Van Wagner was regularly in the presence of other attendees and that a jury could reasonably infer that he was privy to conversations about Antec's earnings – particularly in light of the fact that he was a director. *Id.* at *6-7. The court also held that the suspicious timing of the trades by Van Wagner's children and neighbors provided further circumstantial evidence that Van Wagner had possessed material, nonpublic information and passed it on to others who traded on that information. *Id.* at *8-9. The court denied the defendants' motions for summary judgment. *Id.* at *12.

On the other hand, it is not enough for the SEC simply to identify suspicious trading and ask a jury to infer that it was the product of insider trading. *See SEC v. Truong*, 98 F. Supp. 2d 1086, 1097 (N.D. Cal. 2000) (*Truong*) ("Suspicious trading by itself cannot suffice to warrant an inference that an alleged tipper, the first link on the information chain, traded on the basis of material non-public information."). Furthermore, proof of access to nonpublic information is not proof of possession of that information. *See SEC v. Rorech*, 720 F. Supp. 2d 367, 410 (S.D.N.Y. 2010) ("Potential

'access' to material nonpublic information, without more, is insufficient to prove that [the defendant] actually possessed any such information.").

One of the defendants in *Truong* (Hahn Truong) was a manager of a software group in the engineering department of Molecular Dynamics, Inc. ("MDI"). 98 F. Supp. 2d at 1089. He was not in a senior position and was not made privy to confidential sales and financial information in the normal course of his duties. *Id.* On April 7, 1994 – the day after MDI's first-quarter earnings announcement – MDI's shares closed down 38 percent. *Id.* Truong, an active trader, had sold significant amounts of MDI stock in March 1994; one of the transactions was Truong's largest MDI transaction to date and accounted for 29.6 percent of MDI's trading volume for that day. *Id.* at 1090. Truong's brother and friend also sold significant amounts of MDI shares in March 2004. *Id.* at 1092-94.

The SEC claimed that Truong came into possession of material nonpublic information about MDI's weak quarter-one sales and conveyed that information to his brother and his friend. *Id.* at 1097. The court held that the SEC's evidence was insufficient to withstand Truong's motion for summary judgment as to the majority of the information Truong allegedly possessed. *Id.* at 1098. In doing so, the court rejected the SEC's argument that Truong "had access" to draft securities filings by virtue of his working in an office with open cubicles, having routine interactions with senior management, and working late the same evening as the company controller. *Id.* The court noted that the SEC's position would deem everyone in an office with open cubicles

to have access to confidential information. *Id.* at 1099. Ultimately, the SEC's position was held to be too speculative:

> [A]lthough the SEC may prove that a defendant possessed material nonpublic information through the use of circumstantial evidence (beyond alleged "suspicious" trading), the Agency may not rest on evidence that would require a jury *to speculate* that the defendant possessed that information. Courts stress that the SEC may not base insider trading actions on strained inferences and speculation.

*Truong*, 98 F. Supp. 2d at 1097-98 (citations omitted).

Like *Truong* – and unlike *Roszak* and *Van Wagner* – a finding of liability in this case would require a jury to speculate that certain successful trades were the product of acquiring nonpublic information, simply because a defendant had access to that information. Absent from this case is the kind of circumstantial evidence present in *Roszak* and *Van Wagner* that would support a reasonable inference that Dr. Horn ever had such information. In both of those cases, it was shown that an insider had access to *specific* nonpublic information (a proposed merger or an upcoming earnings announcement); and in both of those cases, numerous associates of the insider then traded shortly after having contact with the insider. Here, Dr. Horn is the only one who is alleged to have engaged in any suspicious trading, and the SEC has failed to put forth evidence demonstrating what specific information was in Dr. Horn's possession.

Indeed, the SEC has done little more than establish that Dr. Horn had five successful trades over the course of eight-and-a-half months and that nonpublic information was available to him – as it was to all employees – at his place of employment. The SEC has no evidence that Dr. Horn accessed any specific EBL reports. Nor has the SEC identified any specific EBL reports that Dr. Horn possessed. The SEC

theorizes that a few successful trades made at some undetermined point in time by Dr. Horn indicates that he must have acquired unidentified reports containing unspecified information, compared it to unidentified analyst reports, drew certain conclusions, and traded in LCAV securities based on that knowledge. This chain of speculation does not raise a material issue of fact for consideration by a jury.

The SEC also argues that Dr. Horn's inconsistent deposition testimony provides the necessary circumstantial evidence to bolster its claims. First, the SEC takes issue with Dr. Horn's testimony that he began trading in options as a means to hedge against a potential loss in the value of his incentive options. Because Dr. Horn's incentive options did not expire until several years in the future, the SEC argues that it made no sense to hedge any associated risk by purchasing put options that expired in three months. Dr. Horn did not testify, however, that he intended for his initial purchase of put options to hedge against a risk of loss on *all* of his incentive options; and the fact that he would not be forced to realize those losses by purchasing stock at a lower price does not impeach his testimony. Indeed, he specifically characterized his position with regard to his incentive options as "paper profit." Pl. 56.1(a)(3) ¶ 9. There is nothing inherently inconsistent in Dr. Horn's statement that he purchased put options to hedge against the risk that the value of LCAV's stock would decrease in the short term.

Further, the SEC argues that Dr. Horn then shifted his theory and asserted that he was trading on the basis of historical price movements. As an initial matter, Dr. Horn's testimony does not show that he changed his theory; Dr. Horn specifically explained that his reasons for his initial options purchase were not the same as his reasons for

14

subsequent purchases. Moreover, as explained above, the SEC has not demonstrated that Dr. Horn's trades were in conflict with the historical patterns Dr. Horn purportedly identified. *See supra* note 3.

Third, the SEC claims that Dr. Horn shifted his explanation as to whether he was trading on a pattern. During his 2006 testimony, Dr. Horn testified that his strategy was to invest until there was a break in his pattern. At his 2008 deposition, he stated that he would continue trading as long as he was making money, even if the pattern was not working for him. The portion of Dr. Horn's deposition cited by the SEC, however, clarifies the issue:

> So in general, both of those statements to me are true. If the pattern is broken, I'd stop trading and if I lost money, I'd stop trading. Both points are relevant to me because as we got into Q3 especially, things happened where I was making decisions during the trading window that weren't even based on this chart and I still would have held to the same tenet. If I had lost a significant amount of money, that the 400,000 that I had decided was my total amount to consider, I would have been done.

September 8, 2008, Tr. 93. He further explained that his decisions depended on his perceived strength of the pattern, stating, "If, if it, for example, had been a Q1 pattern that didn't work, I would have been done, but that's my strongest pattern. Then I would realize it was just luck." *Id.* at 94. Even when all inferences are construed in the SEC's favor, any conflicts in Dr. Horn's testimony regarding his patterns do not constitute sufficient circumstantial evidence that he was actually getting information from nonpublic sources.

Finally, the SEC argues that Dr. Horn falsely testified that he was unable to review EBL reports because he did not have a password to access those reports on a

15

computer. According to the SEC, once a user is logged into a computer, no additional password is required to access EBL reports. Assuming that is the case – there is conflicting testimony on the issue – Dr. Horn's claimed misunderstanding as to what it takes to access an EBL report is not circumstantial evidence that he was actually accessing those reports.

The remaining purported circumstantial evidence is also insufficient to withstand summary judgment. The SEC notes that Dr. Horn violated LCAV policies by purchasing call and put options, but it does not explain how violation of a company policy is evidence of insider trading. The SEC suggests that the size of Dr. Horn's trades is suspect but provides no evidence as to the cost of those trades, Dr. Horn's wealth, or Dr. Horn's trading history to put those trades in context or explain why they were unusual.[6] The SEC argues that Dr. Horn enjoyed "incredible success" with his trading but offers no evidence to explain why his profits on the trades at issue were incredible; nor does the SEC have any evidence of statistical probability to support its claim of incredulity. Def. 56.1(a)(3) ¶ 26.

To survive a motion for summary judgment, a party must "wheel out all its artillery to defeat it." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (citations and internal quotation marks omitted). After investigating Dr. Horn's trading activities for four years, deposing him (twice), deposing

---

[6] Moreover, it is disingenuous for the SEC to assert that Dr. Horn "risked nearly $1 million in options premiums on his bets." Pl. Resp. 17. As alleged in the Complaint, Dr. Horn made a series of successful trades. At no time is he alleged to have had $1 million invested at one time; the largest amount he allegedly invested was $390,477. *See* Compl. ¶¶ 92, 96.

16

fourteen other individuals, and reviewing documents, the SEC has now been forced to show its hand; and it has failed to demonstrate any reason for this case to proceed to trial.

The SEC's admitted lack of direct evidence is not fatal to its case, but the insufficiency of its purported circumstantial evidence is. Based upon the evidence presented in opposition to Dr. Horn's motion for summary judgment, no jury could find that Dr. Horn ever possessed material, nonpublic LCAV information without engaging in speculation. Dr. Horn is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons stated above, Dr. Horn's Motion for Summary Judgment is granted.

Date: 12-16-10

JOHN W. DARRAH
United States District Court Judge